## ESTATE OF JULIA FOSTER, DECEASED.

APPEAL BY J. HERON FOSTER FROM THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued April 10, 1891—Decided April 27, 1891.

(a) In proceedings for an issue devisavit vel non, on the ground of insanity and undue influence, it was alleged as evidence of the former that the testatrix had conceived an intense and uncontrollable hatred of her son, the petitioner, pre-natal in its origin, and culminating in excluding him from participation in her estate.

(b) The averment of undue influence was rested upon the fact that the daughters of the testatrix, her beneficiaries, resided with her in the closest

Opinion of Court below.

intimacy, and opened, read, and concealed from her letters addressed to her by the petitioner; it appeared, however, the testatrix herself declined to receive communications from him:

1. The evidence of the want of testamentary capacity and of undue influence being so doubtful and unsatisfactory that if, on the trial of an issue, a verdict against the will were rendered by a jury thereon, it should not be permitted to stand, it was not error to dismiss the appeal and refuse the issue prayed for.

Before PAXSON, C. J., GREEN, CLARK, McCOLLUM and MITCHELL, JJ.

No. 239 January Term 1891, Sup. Ct.; court below, number and term not shown.

On October 19, 1886, James Heron Foster presented his petition setting forth that he was the son of Julia Foster, who died on November 12, 1885, having, as was alleged, first made and published a certain writing purporting to be her last will and testament, dated May 12, 1875; that said writing was admitted to probate as the last will and testament of said deceased on January 14, 1886, and letters testamentary thereon issued to Julia T. Foster and Rachel G. Foster, therein named as executors. The petitioner, averring that at the time of the execution of the said writing, the said Julia A. Foster was not of sound mind, memory and understanding, and that the execution of said writing was obtained by undue influence, prayed for a citation to show cause why the petitioner should not be allowed to appeal from the said decree of the register, and why an issue should not be framed, etc.

An answer having been filed and testimony taken* after argument, the court, ASHMAN, J., on December 15, 1890, filed the following opinion and decree:

J. Heron Foster, the husband of the testatrix, died April, 1868, after giving by will his entire estate to his wife, but charging thereon a legacy of $25,000 to each of his two daughters, and of $11,000 to his son, reciting that he had already advanced to the son $14,000. He directed that his wife should annually pay the interest on these legacies, but left to her option during life

---

* The testimony was not contained in the paper-books filed for the Reporter.

Opinion of Court below.

the payment of the principal or any part thereof. Julia Foster, the widow, died November 12, 1885, having paid in her lifetime $6,000 of the principal of the son's legacy. Her will commenced with the following provision: "Thinking that my son Heron will have had sufficient given to him when the balance of the legacy from his father has been paid to him, which is at this time about $5,000, therefore I give him nothing." After two annuities of $100 and $150, respectively, she gave to her two daughters the residue of her personal estate absolutely, and real estate for life, with remainders to their children. In case of the death of both daughters in her lifetime, without issue (an event which did not happen) she directed the income of her estate to be paid to the guardian of the children of her son, with this proviso: "In no event do I wish their father appointed, as he is in my opinion not suited to take charge of any interest in my estate." Her will was dated May 18, 1875. A codicil, dated October 25, 1878, was added revoking the annuity of $100. The will and codicil were admitted to probate January 14, 1886, and on October 19, 1886, J. Heron Foster, Jr., the son, took this appeal, alleging insanity on the part of the testatrix and undue influence on that of the daughters.

The allegation of insanity was restricted to one point: That the testatrix had conceived an insane hatred of her son, originating in causes which preceded his birth; that this hatred was uncontrollable and pervaded her conduct toward her son through life; and that it culminated in excluding him from any participation in her estate.

Such a malady, the diagnosis of which, it stands to reason, was profoundly difficult, required all the light which could be had from medical science. The medical testimony, however, was as obscure as the alleged disorder. Only one physician was examined by the contestant. The witness had been himself, at one time, adjudged a lunatic by the Court of Common Pleas of Allegheny county, and was therefore familiar with what may be called the practical side of the question of insanity. After declaring that the testatrix always had an antipathy for her son, which she showed by a seeming desire to get him away from her, and by her indifference when he was the subject of inquiry, he added: "What the original cause of this antipathy was I cannot say, but from what I know of her physical condi-

Opinion of Court below.

tion, as her physician, I have every reason to believe that the cause was a pre-natal one." Here was an opinion fraught with the weightiest results, without a fact to support it; unless a "seeming desire" and an "indifference" to conversations which are not detailed can be called facts. Another witness who was produced as an expert on insanity by the contestant, frankly admitted that he had never received a medical diploma. He described himself as a "scientific lecturer on man, considering him both mentally and physically," and as "making a specialty of both mental and physical diseases." He had fitted himself for his career as an all-around specialist by attending numerous lectures on medical topics, by visiting jails and reformatories, by conversing on lunacy with over three thousand physicians in three years, and in particular by a regular course of private instruction in "temperamental science and physiological incompatibility." Before commencing the study of medicine, he had been "connected with steam machinery as an engineer," an elegant periphrasis for saying that he had once been an engine driver. To a hypothetical question, based upon no evidence, because no evidence whatever had then been given, this witness replied in substance, that a woman who immediately after marriage imbibed a hatred for her husband would be likely to cherish a dislike to his offspring. The foregoing comprises the substance of all the medical evidence, if some of it can be said to have reached that distinction, which was offered to support the theory that a causeless, and therefore, insane antipathy against her son, dominated the mind of the testatrix.

The rest of the testimony to this point was taken under commissions to California and elsewhere. The difficulty in dealing with it is, that it was elicited by interrogatories which were flagrantly leading, and that it was mainly inferential. Thus, one witness declared that Mrs. Foster sent her son from home on every possible occasion, simply to get rid of him. The sole ground of this sweeping accusation was the fact that the witness had heard the testatrix say that "she did not like to look at her son, because he looked like his father." Yet the overwhelming weight of the testimony was that the father, quite as fully as the mother, sent the boy to the country, partly because the boy was sickly, and partly because he wanted to go. So, in answer to the direct question, "State what Julia Foster told

you as to her feelings towards her son prior to his birth?" the witness simply echoed the inquiry thus: "She often expressed her dislike of her son as dating pre-natally." Another witness adjudged the testatrix insane because, while she was devoted to her daughters, she refused to talk with the witness at any length about her son; one of the talks involving an inquiry why her son had not been placed in his father's business. A disturbing element in the value of the various beliefs as to the insanity of the testatrix, is the impossibility of saying how largely they arose from her attitude towards her son in his manhood, when he had either earned some title to her regard, or had justly incurred her aversion, and how largely from her conduct in his childhood when he had done nothing. In the former case, hatred might be cruel, but not necessarily insane; in the latter, whether cruel or not, it would certainly be insane.

The case must turn upon the question whether the prejudice, if it existed, was an insane prejudice; and, to reach an impartial conclusion, we have read with critical care every line of the testimony, numbering as it does, many hundreds of pages and a vast variety of exhibits. It is not safe in passing through that testimony to overlook the rule that one incontrovertible fact is worth a dozen beliefs, however ingenious or plausible. The circumstance upon which the contestant's witnesses laid great stress was, that the testatrix unjustly discriminated against her son in favor of her daughters. Honestly analyzed, the injustice of such discrimination was a matter purely of opinion; a mother, acting from the highest sense of duty, may adopt a policy of repression in the case of a son, which she would not think of pursuing in the case of a daughter. The right or wrong of that course would depend upon her motives, and not upon the opinions of bystanders. The witnesses who testified to the discrimination against the son, were forced to admit that his personal wants were fully met, that he was sent to good schools, and that he was not hampered in his choice of a vocation. Unless we wholly misunderstand his own language, the son's complaint now is that he was permitted to do as he pleased. Indeed, in a letter dated in 1876, he says he was "reared with mistaken kindness." But what were the facts? Of the $25,000 which each of the children was, at the option of the mother, to receive in her lifetime, the son was paid $20,000,

and the daughters received nothing; so that the partiality, if
it had a place outside the brains of the witnesses, was in favor
of the son.

To reach an intelligent judgment, it is essential to know the
leading characteristics of the testatrix.   That she was endowed
with extraordinary mental power no one who reads the corre-
spondence which was placed in evidence can doubt for a mo-
ment.   She was described as bright, genial and quick-witted,
with a cheerful disposition, large common sense, and a firm will.
Her sense of justice was acute, and when that was offended she
was said to be implacable.   But the testimony showed she had
also the womanly qualities.   When only fifteen years of age
the contestant met a bar-room maid, two years his senior, who
was the daughter of a country-tavern keeper, and whom he
soon promised to marry.   Thereupon, he proposed to his
parents that they should receive the young woman into their
own home, and educate her in a manner suitable to one who
was to be his wife.   Astounding as it may seem, when the
theory of maternal hatred is considered, this proposal was ac-
cepted, and the girl lived for some four years in the family, on
the same social footing with the daughters, and until, by her
own act in clandestinely marrying the contestant, she termi-
nated the relationship.   Years afterwards, the mother, in writ-
ing to her son, referred to that period in these words : " I know
well how to sympathize with you in your want of sleep, for I
can say of a truth that during the last three years and a half
that Nellie (the son's wife) was with me, I never knew what
sleep was ; I was too unhappy.   It was not that I had any-
thing personally against Nellie, but that she was forced upon
me, and it put us both in an unnatural position.   No good can
ever come of such conditions."   And again : " The misery and
unhappiness it caused me, no tongue could ever tell.   A wound
was made which time has never healed.   But I lay no charge
to Nellie."

One other incident is significant.   The testatrix kept locked
up, in what was known in the family as " the silver trunk,"
her papers and other valuables, including letters from her hus-
band and son.   When this trunk was opened after her death,
it was found to contain, among other mementos, a small pack-
age inclosing two locks of hair wrapped in paper.   On this

paper was written in pencil, evidently of long standing, in the mother's handwriting: " The first hair cut from the head of my darling boy—my first born. Julia Foster. 1842." The year upon that paper was the year, or about the year, of the contestant's birth. This is a fact dating back almost to the birth of the child, and hidden throughout the life of the mother, which could have originated in no fraud or hypocrisy whatever, and which no human ingenuity can reconcile with any hypothesis of hatred, whether natal, pre-natal, or post-natal.

The consequences which must ensue, if the theory of the contestant shall be countenanced, will be startling. Because, if every petulant word which a parent may have uttered during a lifetime shall be treasured up and then marshaled in unbroken array after his death, and in such shapes as memories, more or less treacherous, shall see fit to assign, it might be possible to convict almost any one of injustice to his offspring. If, in addition to this, witnesses shall be allowed to speculate as to the moods of temper in which these words were spoken, and ascribe them to causes for which there were no corresponding facts, it is possible, and indeed highly probable, that any father might be adjudged insane; the degree of his lunacy varying with the greater or less vividness of the imagination of the witnesses. To take one occurrence out of many, appearing in the evidence in this case, and relied upon as a proof of the decedent's hatred of her child: When a boy, the contestant was found shut up in a dark room, with a shade over his eyes, which the witness hinted was intended to make his appearance eccentric. Yet there was not a shadow of proof to connect the mother with the transaction, while there was abundant proof that the boy was often tormented with weak eyes, and was even sent to the country to strengthen them. Thus, what, if it ever took place at all, was an effort to relieve the child's sufferings, was distorted by the witness into an act of barbarity.

If facts were shown from which an inference would be possible that the testatrix felt for her son such a hatred as has been alleged—a hatred so superhuman that it even preceded his being—the subsequent conduct, either of the mother or son, would have small place in this inquiry. But to raise such

Opinion of Court below.

an inference, the evidence must be something more than a mere scintilla; it must not rest wholly upon a few querulous expressions of the testatrix, resurrected after many years out of the reminiscences of two or three aged witnesses, nor upon the opinions of these witnesses as to the motives which influenced the testatrix. Assuredly, no inference based upon such proofs will stand, when it is confronted with acts of the decedent which not only contradict the language imputed to her, but could never have been performed at all if these motives had swayed her. It is true that her will was quoted as proof of an insane antipathy to the contestant, because it gave him nothing, and declared that he was not suited to take charge of any interest in the estate. It is also true that these provisions were not inserted upon a sudden impulse, because, in a will written six months after the husband's death, she had asserted that the sum which was due her son from his father's estate, and which then amounted to $11,000, was in her judgment sufficient for him. But, before the date of either paper, the contestant had shown on a larger scale than afterwards, because he had more money at his command, an utter incapacity for any financial dealings. The mother was as shrewd and exact in her business transactions as the son was reckless and loose in his, and she very aptly pictured him, when she said to one of the few persons who had her confidence, that she thought he was visionary, and that " he could reduce two dollars to one quicker than anybody she knew." He rejected steadily the advice which she proffered, 'and, in conjunction with his uncle, he even tried to induce her to put the control of the fortune which she had skilfully augmented, into his own hands. Looking at the matter from the standpoint of dollars and cents, it is not altogether surprising that a woman of austere notions of business methods and business moralities, should refuse to add to what the father had provided for a son who had shown himself thriftless, and declare that he was unfit to be trusted with any part of her estate ; and this was all that the will said, and all, perhaps, that it meant.

But it is unjust to the decedent to assume that chagrin at her son's failures, or contempt for his incapacity, was the sole or even the moving cause of the decedent's action. Something in his conduct or attitude towards her had occurred as

far back as the date of her first will, to excite her resentment. Thus, in May, 1870, she wrote to him: "No conduct of yours could surprise me now." So in June, 1870, in reply to his message that he was coming to ask her for two thousand dollars, she replied: "I much prefer you not to come to Pittsburgh. I forbid it. I cannot see you after your conduct to me when we last met." At the risk of being minute, we will produce another extract from the former letter: "When a dearly loved and cherished and only son, tenderly cared for, can so far forget his love, his duty to his mother, as you have, what pleasure, what satisfaction can I feel in you? . . . . You, Heron, ought to be the last one to utter a complaint against your parents. Too generous have we always been to you. Think of the thousands you had before our home was paid for; and speaking of its purchase recalls to my mind a tableau in which you and I were principals. I cannot soon forget it; it needs the emphasis which you put upon it, and that cannot be written. You were complaining to me of want of money, and I was in the act of giving you one of the three twenty dollar notes, which I had saved for the express purpose of papering the house, and I was the while chatting of our possessing a home, and the pleasure I felt in its ownership, when you said, ' Well I think Pa had a good deal better help me than buy this house for you.' . . . . Again and again has my mother's heart said to you, come with your little family and let us nurse you, and let us cherish and make you well again; but prudence and experience warned me not to listen to its call. . . . . It grieves me that there is any necessity for writing so severe a letter."

There was, however, a tempus pœnitentiæ in the long interval which elapsed before her death, during the whole of which the will remained in her possession; and in that time the mother's affection, if not repulsed, might have asserted itself even against her prudence. The after history of the son then becomes important as showing what reason he furnished for any relentings on her part. He removes all doubt on the subject by the sketch, which he drew, apparently with some exultation, of his various enterprises, and we shall hardly be accused of unfairness, if we confine our narrative under this head, to what fell from his own lips and in his own behalf. According to that story, his early predilection for a rural life

Opinion of Court below.

was indulged by his father, who placed him on a farm of eighty-three acres, near Pittsburgh, where, for three years, he raised grapes, or attempted to raise them, but failed. He made a similar attempt to cultivate small fruit in New Jersey, and failed; sold trees in Iowa; established himself in an Orange grove in Florida, where the fruit was killed by frost; lost his crops in Kansas by reason of the drouth; and succumbed in Colorado to a combined attack of grasshoppers, beetles and worms. After exhausting the possibilities of agriculture, he became treasurer of the Tangerine Development Society, an institution which issued circulars, inviting settlers to settle; and secretary of the Lake Ola and Tabares Transportation Company, which received its subscriptions in land. He originated the Lake View Co-operative Industrial Association, the officers of which appear to have been himself, his wife and his son; and the Canal, Irrigating Ditch and Tramway Company, of which, if it had got beyond the incubating period, he would have been the president. He also edited the Industrial Co-operator, a publication which could hardly be called a periodical, because it expired with the first number. In this diversity of pursuits, he found some time for the study of systematic theology, his progress in which was marked by his successive belief in Evangelical Lutheranism, Liberal Universalism, and Progressive Communism.

At the time of the will contest, he was investigating the phenomena of Spiritualism, and had already acquiesced in what he called the "basic facts" of that occult philosophy. The phase of his history, however, which is most pertinent, because, more than any other, it affected his relations with the testatrix, was that which was exhibited in his matrimonial vicissitudes. He abandoned his wife after she had borne him three children, and he afterwards obtained a divorce, on the ground that she had deserted him. He then married a woman, who was known as Myrtle, and who lived in a community of "pentecostal ideas," whatever that may denote, at Cedar Vale. Here he found himself, as he happily phrased in his correspondence, in "the promised land of sweet peace." The marriage to Myrtle was evidenced at first by an agreement without witnesses; but it was subsequently solemnized by a religious ceremony, in which, through a curious coincidence, the origi-

Opinion of Court below.

nal husband of the woman acted as the celebrant. The discovery that this marriage was void because the first husband was living, and that the divorce from his own wife was invalid, because she had received no notice of the suit, so far confused his perceptions that when the contestant was asked before the examiner, whether he was married or single, he replied that he was not sure which.

This erratic mode of life was not calculated to induce the testatrix to modify the determination which she had expressed in her will, and it lacked even the poor compensation of affording a decent livelihood to the contestant. In a business so remote from speculative risks as farming, he sunk in five years the sum of $14,000, which had been given him by his father, just as he afterwards lost the sum of $6,000 which followed it. Nor was this all. In every interview which he had with his mother, and in nearly every letter which he wrote to her, he made a demand, more or less importunate, for money, not always in the most decorous terms.

On one occasion he was said to have exclaimed that he would go to the mouth of hell, but that he would have what he then wanted; a destination, it may be added, he would probably have reached if the impulse to suicide which he avowed possessed him, had been gratified. Stupidly indifferent to the result which a knowledge of his follies would have upon a mother whom he knew to be high-strung, he even undertook to defend them. The sequel might have been foreseen; the testatrix refused to read or even to open his letters, and she diverted from the annual income which had hitherto been paid him, a portion for the support of the children whom he had neglected.

But it is not worth while to go further into testimony, all of which tends to the same end. Whether the testamentary act under discussion was prompted by indignation at the behavior of the son, or by a conviction that any gift of money in addition to the father's legacy would positively injure him, or whether it resulted from a mere caprice, is a matter of equal indifference. Even if she acted from hatred, the mischief would be without remedy, unless the hatred was absolutely causeless, and for that reason presumably insane. The contestant has steered clear of all ambiguity on this point, and

Opinion of Court below.

has charged against his mother a hatred which touched the
acme of insanity, when it was conceived, according to his
theory, before its victim came into existence.  But his theory
had this disadvantage; if we believe that a thing so incredible
as a pre-natal hatred of her offspring filled the mind of the tes-
tatrix, we must also believe a thing even more incredible, that
hatred was never evidenced by a single unmistakable act on
her part.  Neither of her wills was such an act.  Her son was
never unprovided for.  When her first will was written $11,000,
and when the second was written $5,000, still remained to him
of his patrimony.  The testatrix was not dealing with a child,
against whose acts of thoughtlessness might be set off the rea-
sonable hope that experience would be a teacher, but with a
man, whose every subsequent folly appeared to emulate the
faults which had preceded it.  Judging by that experience,
she might not unnaturally have reasoned that his hope lay up-
on being thrown on his own resources, for in the long history
of his mishaps, the chapter upon which he dwelt himself with
the most complacency, comprised the period when he was work-
ing upon a salary.

The allegation of undue influence is in keeping with that of
insanity; indeed, it can hardly, with any show of propriety, be
regarded as an element in the case.  It was based upon the
fact that the daughters resided with their mother, and were
admitted to her closest intimacy, and that they opened, and
read, and concealed from the mother, letters which were ad-
dressed to her by the contestant.  As to the first branch of this
complaint, we need only repeat what was said in Woods' Est.,
13 Phila. 236, and in effect in Lang's Est., 44 Leg. Int. 431;
Dean v. Negley, 41 Pa. 317, and Miller v. Miller, 3 S. & R.
269, that a legatee who makes her home with a testator will
not, on that ground alone, be presumed to have unduly influ-
enced the testamentary act of the latter; and as to the second,
that the mother herself positively refused to receive any com-
munication at the time from her son.  In our opinion, aided as
we have been by an argument of great ability by counsel on
both sides, the evidence of insanity and undue influence is so
doubtful and unsatisfactory that a verdict against the will
should not be permitted to stand; and, following the principle
which has been often laid down: see Cozzens' Will, 61 Pa.

196; De Haven's App., 75 Pa. 337; Wainwright's App., 89 Pa. 220, we dismiss the appeal and the petition for an issue, and decree that the costs shall be paid by the petitioner.

—Thereupon, the petitioner took this appeal, specifying, inter alia, that the court erred:

14. In holding that the evidence of insanity and undue influence was so doubtful and unsatisfactory that a verdict against the will should not be permitted to stand.

15. In dismissing the petition for the appeal and for an issue.

*Mrs. Carrie B. Kilgore*, for the appellant.

Counsel cited: (1) Section 41, act of March 15, 1832, P. L. 146; Cozzens' Will, 61 Pa. 197; De Haven's App., 75 Pa. 337; § 6, act of May 19, 1874, P. L. 206; Schwilke's App., 100 Pa. 631.    (2) Pidcock v. Potter, 68 Pa. 342.

*Mr. James S. Williams*, for the appellees.

PER CURIAM:

The opinion of the learned judge of the Orphans' Court is so full and satisfactory that we affirm the decree for the reasons given by him.

> The decree is affirmed, and the appeal dismissed at the costs of the appellant.

On May 18, 1891, a motion for a re-argument was refused.